[No. 38343.    En Banc.    December 29, 1966.]

ANDREW N. APOSTLE et al., Appellants, v. THE CITY OF SEATTLE, Respondent.*

*Reported in 422 P.2d 289.

*Schweppe, Reiter, Doolittle & Krug,* for appellants.

*A. L. Newbould* and *Gordon F. Crandall,* for respondent.

*The Attorney General, Edward B. Mackie* and *James Wilson, Assistants* (appearing under authority of RCW 7.24.110).

HILL, J.—More than a score of plaintiffs, all owning property in that portion of Seattle just north of Lake Union and west of the University of Washington (bounded on the north by East 40th Street, on the east by University Way N.E., on the south by N.E. Boat Street, and on the west by the University Bridge) known as the proposed "University Addition-Northlake Urban Renewal Project," commenced this action to enjoin the taking of their property by eminent domain proceedings, which the City of Seattle admits it intends to institute under the so-called Urban Renewal Law, RCW chapter 35.81.

The trial judge, though expressing the opinion that the "area is not a 'blighted area' as so defined and is an area attractive to private investment," felt bound by our opinion in *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963) and made findings of fact and conclusions of law which were the foundation for a judgment which specifically upheld the constitutionality of the Urban Renewal Law; and held that the determination by the Seattle City Council, con-

cerning the area above described, was not arbitrary and capricious and dismissed the action.

The plaintiffs appeal.

It will greatly simplify the discussion of the decisive issue and shorten this opinion, if it be announced at the outset that the judges signing the majority and minority opinions in the *Miller* case, *supra,* like the woman convinced against her will, continue to be "of the same opinion still" relative to that case. This is not *that* case.

A majority of the court are agreed that the judgment of dismissal entered herein must be set aside; but they are not thereby casting any doubt on the constitutional validity of urban renewal programs, and there is no retreat in any respect from the holdings in the *Miller* case. That was a relatively strong case on the issue of the existence of a blighted area, whereas this is a relatively weak case on that issue, if, in fact, it is a "blighted" area.

It is pointed out in an article in 78 Harv. L. Rev. 801, 803, that clearance and rehabilitation programs are only appropriate for, and are normally limited to, highly deteriorated neighborhoods. The appellants assert that the only reason the area with which we are here concerned is involved in an urban renewal project is that the University of Washington may ultimately acquire it from the City of Seattle for an extension of the university's campus, with the federal government paying two-thirds of the cost of acquisition. The appellants argue that the University can, and should, exercise its own power of eminent domain and that the case of *State ex rel. Tacoma School Dist. v. Stojack,* 53 Wn.2d 55, 330 P.2d 567 (1958),

> demonstrates precisely how the University of Washington should have acquired this valuable tract of land by its own power of condemnation rather than through the devious method it is attempting to use with the respondent City of Seattle. (Appellants' answering brief to brief of Attorney General, p. 2)

Parenthetically, we see nothing "devious" about the "method" employed by the University of Washington.

There is nothing sinister or malevolent in its openly expressed desire to acquire the property in this area if it is, in fact, blighted.

■ We are not here concerned with the moral, ethical, or economic principles which may be involved in the present proceeding. We are not impressed, as a legal proposition, with the appellants' apparent desire to choose their condemner. Theoretically, at least, they would, in either instance, receive the fair market value of their property. The impelling motives involved in the condemnation of property in this area, if it be, in fact, "blighted," are not here material. *Despatchers' Cafe Inc. v. Somerville Housing Authority*, 332 Mass. 259, 264, 124 N.E.2d 528 (1955).

■ Nor are we impressed by the appellants' vigorously expressed contention that the notice and hearing requirements (which, concededly, were met by the city[1]) did not satisfy due process requirements. It is urged that each property owner should have been informed of the defects assigned to his property, otherwise the persons involved could not adequately prepare for the hearing and were thereby hampered in presenting their arguments in rebuttal to the planning commission's presentation.

As pointed out in *Miller v. Tacoma, supra,* the City Council of Tacoma was concerned with an area concept and not with whether any particular property was standard or substandard. See *Berman v. Parker,* 348 U.S. 26, 35, 99 L. Ed. 27, 39, 75 Sup. Ct. 98, 104 (1954).

---

[1]RCW 35.81.060(3): "The local governing body shall hold a public hearing on an urban renewal plan after public notice thereof. Such notice shall be given by publication once each week for two consecutive weeks not less than ten nor more than thirty days prior to the date of the hearing in a newspaper having a general circulation in the urban renewal area of the municipality and by mailing a notice of such hearing not less than ten days prior to the date of the hearing to the persons whose names appear on the county treasurer's tax roll as the owner or reputed owner of the property, at the address shown on the tax roll. The notice shall describe the time, date, place, and purpose of the hearing, shall generally identify the urban renewal area affected, and shall outline the general scope of the urban renewal plan under consideration."

We come now to what seems to us the decisive issue: Did the City Council of the City of Seattle make an adequate finding that the area now under c o n s i d e r a t i o n was "blighted"?

The statute requires that upon the completion of the hearing by the local governing body, an urban renewal project may be approved if that body (the City Council in this case) makes certain findings,[2] including one that the urban renewal project area is a "blighted" area as defined in RCW 35.81.010(2).

The council made eight findings essentially in the language of the statute. With respect to "blight," the finding reads:

(1)   That the said urban renewal project area is a "blighted area" as defined in RCW 35.81.010(2).

The appellants argue that there is no specification of the type of conditions found that constituted "blight"; that this is a travesty, as a finding of fact, and that it amounts to no more than applying an arbitrary label.

The city urges that the legislature, by requiring findings, meant nothing more than that there be an administrative determination.

■■  It is our view that the City Council, having been vested with a special and limited jurisdiction by statute, i.e., to determine whether an area is blighted, it must affirmatively appear that it acted within the limits of its jurisdiction just as in the case of any other tribunal of limited jurisdiction. Certainly, some facts must be found

---

[2]RCW 35.81.060(4): "Following such hearing, the local governing body may approve an urban renewal project if it finds that (a) a workable and feasible plan exists for making available adequate housing for the persons who may be displaced by the project; (b) the urban renewal plan conforms to the comprehensive plan or parts thereof for the municipality as a whole; (c) the urban renewal plan will afford maximum opportunity, consistent with the sound needs of the municipality as a whole, for the rehabilitation or redevelopment of the urban renewal area by private enterprise; and (d) a sound and adequate financial program exists for the financing of said project; (e) the urban renewal project area is a blighted area as defined in RCW 35.81.010(2)."

which indicate that the Council knows what constitutes "blight" and which support the ultimate finding that the area is blighted, hence subject to condemnation and resale under the Urban Renewal Act.

The findings of the City Council must be sufficiently specific so that anyone reading them can determine what evidence in the record led to the Council's determination that the area was "blighted."

We indicated in *Miller v. Tacoma, supra* (pp. 385-86), that some of the criteria of "blight" set forth in the urban renewal statute have no effect on public health, safety, morals, or welfare, and

> may also be suspect as insufficient to support a constitutional "public use." [3]

Here, no one can tell from the city's bare conclusion of "blight" whether that conclusion was founded on criteria which support a constitutional "public use." The findings should make clear whether it was a health hazard, a safety hazard, a moral hazard, a public welfare hazard, or any combination thereof which led to the conclusion of "blight."

The trial court did not regard the area in question as a blighted area, but considered itself bound by *Miller v. Tacoma, supra,* to uphold the determination of the City Council that this was a blighted area. We would agree that the conclusion of the trial court on the issue of blight (likewise, the conclusion of this court) is not material, as neither this court nor the superior court has been designated by the legislature to determine from the evidence submitted whether or not an area is "blighted." The legislature has designated "the local governing body" (City Council) to make that determination. However, the courts should not approve such a determination unless it rests on certain basic criteria that will support a constitutional public use.

The courts will not interfere with a determination by a local governing body merely because of lack of accord with

---

[3]This is, likewise, the view of the Supreme Court of Maine expressed in *Crommett v. Portland,* 150 Me. 217, 107 A.2d 841 (1954).

its conclusion, provided, in cases such as this: (a) the protesting property owners have been given an adequate opportunity to be heard; (b) it is clear that criteria have been applied which will support a constitutional public use; and (c) there is sufficient evidence supporting the specific finding or findings of fact upon which an ultimate determination of "blight" is based to prevent its being regarded as an arbitrary or capricious determination.

The *Miller* case, *supra,* presents a good illustration of a local governing body making clear the conditions and circumstances which constituted "blight." The Tacoma City Council made a finding that there was a combination of factors which constituted a menace to the public health, safety, welfare, and morals in the then existing condition and use of the area there in question. Among these factors were extreme fire danger, unsanitary and unsafe conditions throughout the entire area; heavy rodent infestation with the ever-present danger of disease transmission; improper ventilation, light and sanitary facilities; physical dilapidation, deterioration and defective construction, with parcels of land where the tax or special assessment delinquency exceeded the fair market value of the land.[4] There was evidence to support these findings. Indeed, there was no real contention, in that case, that the area itself was not blighted—Miller was urging that his property was not blighted and should not be condemned. We held that an area concept prevailed and that the presence of well constructed and properly maintained properties did not prevent an area from being blighted.

Against findings of this character by the Tacoma City Council put the finding of the Seattle City Council, *i.e.,* "That the said urban renewal project is a blighted area."

We are here confronted with a determination framed in statutory language without the suggestion of any specific

---

[4]This last finding, relative to delinquent taxes and assessments exceeding the value of the land, might not in itself indicate a menace to health, safety, morals, or welfare, but it does indicate the hopelessness of any rehabilitation from within the area itself.

facts which support that determination. A reviewing court cannot possibly identify the criteria used by the Seattle City Council in its determination that the area in question was a blighted area.

The cause is remanded to the superior court with instructions to set aside its order of dismissal and to grant the property owners' motion to send the case back to the Seattle City Council to enable it, if it can, to make a specific finding of the existence of conditions within the area having an effect on public health, safety, morals, or welfare that are sufficient to constitute "blight."

ALL CONCUR.