371 A.2d 590.

CITY OF CRANSTON *vs.* JOHN J. HALL *et al.*

MARCH 31, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

22

KELLEHER, J. The petitioner in this certiorari proceeding is the City of Cranston (the city); the respondents are Local 1363, International Association of Firefighters, AFL-CIO (the union) and the members of an arbitration board (the board) convened pursuant to the Firefighters' Arbitration Act, G. L. 1956 (1968 Reenactment) §28-9.1-1 et seq. This is the second time within a year that the city has appeared before us seeking reversal of the board's award insofar as it pertains to the promotion of firefighters to the ranks of lieutenant and captain.

The arbitration award of April 10, 1975, governing the contract period running July 1, 1975 to June 30, 1976, provided that when appointing to the ranks of captain or lieutenant, the appointing authority, who in this instance is the mayor, shall name the person who ranks first on the civil service list of eligible candidates. This procedure was proposed by the union and replaced the former one-in-three rule, which permitted the mayor to appoint any one of the three top candidates. Our first ruling in this case came in March, 1976 when we addressed various questions raised by the city. At that time we recognized that the city's promotional procedure was a bargainable issue under the Firefighters' Arbitration Act but remanded the record to the board so that it could set out the evidence upon which it

predicated its conclusion that department efficiency and employee morale would be improved by modifying the promotion procedures in the manner proposed by the union. *City of Cranston* v. *Hall,* 116 R. I. 183, 187, 354 A.2d 415, 418 (1976). The remand also made it clear that the board was free to confine itself to the existing record or take additional testimony. Upon remand, the city sought to present additional testimony to the board before it issued its supplemental decision.

On April 27, 1976, the board issued two supplemental decisions, one of which denied the city's request as to further testimony. The other, in response to our directive, set forth the evidence underlying the board's conclusions regarding promotions. That decision also directed that the collective bargaining agreement beginning July 1, 1975, be amended in accordance with the award.

The city now contends that the award is erroneous and illegal for three reasons: first, it is founded on mere speculation rather than evidence; second, the board refused to take additional testimony offered by the city following this court's March, 1976 remand; and finally, the award purports to act "retroactively."

To put the evidentiary facets of this controversy in their proper perspective, we must describe at some length what transpired at the 1975 hearings. The hearings spanned a 3-day period that began on February 26 and ended on February 28. All witnesses were subject to being cross-examined, and there were times when the arbitrators would question a witness. The transcripts presented to us deal with the last two days of testimony. Most of the second day's testimony was given by union witnesses to support the union's position on the various proposals pending before the board.

The first four witnesses on February 27 offered testimony in support of the proposal which would make it mandatory

that the promotion would go to the candidate who occupied the first position on the promotional list. The balance of the union's presentation was given by six other witnesses whose testimony dealt with a variety of matters including longevity, a reduced work week, sick leave, and a wage increase.

The city's testimony began in the late afternoon of the second day. Before the meeting was adjourned, the board had heard from the city's planning director, its public welfare director, and the director of Cranston's community action program. The next day another six witnesses testified for the city. They included the mayor, the tax assessor, the personnel director, an economist, and the fire chief. The only witnesses for the city whose testimony touched on the officer-promotional-policy question were the director of personnel and the fire chief.

The union witnesses who appeared in support of the promote-the-top-man issue detailed instances where the use of the choice-of-the-top-three system permitted the mayor to reach down the promotional list and select an individual whose initial position on the list was as low as fifth or sixth, while some of those who were ranked in the top three would remain in the also-ran category. The union presented as exhibits the promotional lists that were posted at various intervals from 1967 on through 1974. Promotional examinations were given at approximately 2-year intervals. A successful candidate's initial place on the list was determined by totaling the points he received for seniority and the scores he attained on his written and oral examinations. The oral examination was given by a board of officers from fire departments other than Cranston's. The board had before it the competency reports of each candidate. These reports are evaluations of candidates' on-the-job performance by his superior officers.

One witness, who holds the rank of captain, testified that a candidate's promotion potential depended upon the amount of "political clout" he could muster. In testifying that he had seen how the passing-over process affected the department's morale, this witness offered the wry comment that "* * * with a little manipulation you could be third on the promotion list for twenty years." Other qualifiers who were passed over for promotion described conversations they had with the chief where, after expressing their disappointment with the turn of events, they were informed that they were not "thinking administratively" or that their lack of upward mobility was attributable to either their participation in the union's opposition to the chief's promotion or its support of a mandatory retirement plan which would have forced the chief to retire. One of the witnesses was the number-four man on the 1974 captain's list, which contained six names. When the mayor appointed the sixth man, the witness sought out the chief and was told by the chief that the witness did not gain the recommendation because the chief "owed the position" to number six. A veteran of 25 years' service in the department whose name appeared upon the list of those eligible for promotion to lieutenant on several different occasions and who had taken several collegiate and other courses of instruction which all related to his duties as a firefighter told of being passed over at least seven times. At one point he had invoked the grievance procedures when the chief had removed his name from the promotional list. The witness' name was returned to the list, and he also received a monetary award. This witness claimed that the "pass overs" were due to the "few disagreements" that he had had with the chief "over the years." The union also stressed that under the city's personnel rules a selectee who did not measure up could be removed during his 6 months' probationary period.

The personnel director's testimony as it related to the promotion policy was very brief. Most Rhode Island municipalities, he said, use the one-in-three system of promotion. He was aware that the choice in the neighboring city of Warwick was limited to the top man and in Woonsocket the city's ability to pass over the top man was limited to one pass over.

Later, when the chief testified on this subject, the city solicitor directed a series of leading questions to him. The solicitor prefaced his first leading question by telling the chief that he was not to get into the merits of each individual case that had been referred to by the union's witnesses. Thereafter, the chief was asked (1) if he believed that the recommendations he made at the time when the previous day's witnesses were being passed over were based on "good reason," (2) if he felt that in each instance he had recommended "the most excellent man," and (3) if he thought that each decision he made was in "the best interest of the city and fire department." The chief said "Yes" to the first two inquiries and replied, "I most certainly do" to the question which related to his concern for the city's and department's mutual interests. Once the solicitor had received this emphatic answer, he announced that his interrogation was complete. The union's attorney and its representatives on the board each said that they would ask no questions. The solicitor then asked the board chairman "[i]f you want to go into [a] rebuttal of each statement?" After the chair answered "No," the union's attorney said that he was not interested in "any further cross-examination on the subject of the presentation of additional evidence. Let it drop."

At this point the city's representative on the board[1] remarked that the union had had "a day and three-quarters" to present their testimony, and if the city wished the same opportunity, they should have it. Thereupon, he suggested that as a time-saving device the solicitor could summarize the response which the chief might have made. The solicitor volunteered that he could respond to statements made by three of the witnesses. The union's attorney then observed that he was sure the chief would not agree with the trio's testimony because the chief would not be expected to say he made unreasonable appointments. The chairman said that the record indicated that the chief had repeatedly insisted that his recommendations "were based on what he felt was sound judgment." Once this comment was made, the solicitor said all right and began to examine the chief as to his opinion about the union's desire to reduce the work week. No other testimony was elicited on the promotion proposal.

In challenging the board's promotional decision, the city contends that it is contrary to the evidence and illegal. We think it appropriate to point out that the city is before us seeking review by way of common law certiorari. The scope of our review in such circumstance is limited to a

---

[1]The General Assembly has enacted legislation calling for binding arbitration on all issues that remain unresolved 30 days after the bargaining agent for either the full-time police officers or the permanent uniformed members and all employees of a paid fire department and a municipality have begun negotiating a new contract. The provisions of the Firefighters Arbitration Act and the Policemen's Arbitration Act regarding the composition of a precontract arbitration board are identical. The board is to be composed of three members. The union selects one member, and the municipality selects the other. If the two selectees are unable to agree on the third member, the Chief Justice of this court makes the choice. The third choice, whether it be by agreement or the Chief Justice, acts as chairman. *See* G. L. 1956 (1968 Reenactment) §28-9.1-8 as amended by P. L. 1968, ch. 150, sec. 1. In the case at bar, the decisions under review each contain the dissent of the arbitrator selected by the city.

determination of whether the subordinate tribunal acted within its jurisdiction and, if so, whether it abused its jurisdiction. *City of Providence v. Local 799, International Ass'n of Firefighters,* 111 R.I. 586, 305 A.2d 93 (1973). Having previously determined that Cranston's promotional policy was subject to arbitration, the only question now before us is whether the board has abused its discretion. In making this determination, we do not weigh evidence or act as fact-finders. All we shall do is to examine the record made before the board to determine whether it contains any competent evidence that would support the board's action. *Lemoine v. Department of Mental Health, Retardation and Hospitals,* 113 R.I. 285, 320 A.2d 611 (1974).

In its promotional decision the board observed that the promotional lists revealed a constant pattern of pass overs regarding the three witnesses who described their verbal confrontations with the chief. While the chief, in essence, testified that he always recommended the person who he felt was best qualified, there is in the record competent evidence which would support a finding that "political clout" as well as the chief's personal likes and dislikes played a part in his recommendations and that the consequent passing over affected the men's morale. Consequently, having in mind our limited function in this controversy, we will not disturb the board's findings.

In seeking a reversal of the board's refusal to listen to additional testimony, the city claims that an examination of the colloquy which ensued after the city had concluded its questioning of the chief makes it clear that the chairman arbitrarily foreclosed the city from introducing evidence which would have disputed that presented by the union. The city claims that this "cutoff" was extremely prejudicial, especially in light of the board's remarks in its promotional decision about the chief's failure to deny

or refute the testimony of the unionists who testified about life during a time when any one of the first three on the list could receive the promotion.

Arbitrators are free to fashion rules and determine the facts of a dispute before them and, in the absence of complete irrationality, their award will not be subject to judicial revision. *Belanger* v. *Matteson*, 115 R.I. 332, 356, 346 A.2d 124, 138 (1975). Attorneys are presumably schooled about the necessity of using precise language, but there is no requirement that an arbitrator be an attorney. One of the arbitrators whose decision is under review is a firefighter. The other, now deceased, at the time of the hearing was a retiree who, previous to his retirement, had served as Rhode Island's Director of Labor and as the personnel director at one of the state's largest manufacturing facilities. Semantics are meaningless in this situation because whether the arbitrators used the words "deny," "refute," or whatever, it is clear that at the time the city announced that its brief examination of the chief was at an end the witness had not uttered one word that directly contradicted the previous day's testimony which gave rise to the inference that the chief apparently looked with favor upon those who he thought were "thinking administratively" and with disdain upon those whose thoughts were more union oriented, especially in matters that concerned the chief's professional advancement and tenure. In its decision concerning the need for additional testimony, the board's reasoning that each statement given by the union need not be specifically refuted is sound, especially in light of the generalities to which the chief had testified. The board in its decision made it clear that it had a fair idea of what the additional testimony would consist and, in its opinion, such testimony would be merely cumulative. Arbitration hearings are intended to be vehicles for the speedy disposition of disputes, not endur-

ance contests. Arbitrators should be free to decide whether additional testimony is necessary or whether a reopening will unduly prolong the proceedings. The board reminded the litigants that there comes a time when an arbitration proceeding must come to a final end. That time, according to it, was February 28, 1975, at which time the original hearing concluded just after the union's attorney had said: "I don't see any necessity to argue with 140 exhibits." We see no reason to disagree with the board's judgment that the hearing should not be reopened.

■ The final bone of contention is whether or not the board's award is to be read as being effective as of July 1, 1975. Following the April 1975 award, the city and union entered a collective bargaining agreement for the year running from July 1, 1975, to June 30, 1976. In that contract the clause dealing with promotions provided in part that in light of proceedings before the Supreme Court, "the provisions of this section will await a decision by the Supreme Court." The supplemental decision of April 1976 directs that the collective bargaining agreement commencing July 1, 1975, shall be amended in accordance with the board's decision, i.e. hire the top man on the list. Now the city contends that the 1976 arbitration award can be interpreted only prospectively; that insofar as it purports to act retroactively, back to July 1, 1975, it is invalid.

This contention is without basis. The arbitration board's jurisdiction was over the July 1, 1975, to June 30, 1976, contract period. The original decision and award properly pertained to that period. No stay was ever sought by the city. The board did not make its supplemental decision and award retroactive; the award applies to the contract period for which arbitration was conducted.

The petition for certiorari is denied and dismissed. The writ heretofore issued is quashed.

*Peter Palombo, Jr.,* City Solicitor, for the petitioner.

*Hogan & Hogan, Thomas S. Hogan,* for respondents.